Jeffrey B. Isaacs, Esq., SBN 117104
jisaacs@iflcounsel.com
Jerome H. Friedberg, Esq., SBN 125663
jfriedberg@iflcounsel.com
**ISAACS, FRIEDBERG & LABATON LLP**
555 South Flower St., Suite 4250
Los Angeles, California 90071
Telephone (213) 929-5550/Facsimile (213) 955-5794

Attorneys for Plaintiff Dwight J. Freeney

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DWIGHT J. FREENEY,<br>    an individual;<br><br>                Plaintiff,<br><br>        vs.<br><br>EVA D. WEINBERG aka Eva Bock,<br>    an individual;<br>RICHARD A. WEINBERG,<br>    an individual;<br>METROPOLITAN LIFE INSURANCE<br>COMPANY dba MetLife,<br>    a New York Corporation;<br>MASSACHUSETTS MUTUAL LIFE<br>INSURANCE COMPANY dba<br>MassMutual,<br>    a Massachusetts mutual life<br>    insurance company;<br>NEW YORK LIFE INSURANCE<br>COMPANY,<br>dba New York Life<br>    a New York mutual life<br>    insurance company;<br><br>                Defendants. | Case No.  2:14-cv-5245<br><br>**COMPLAINT FOR MONETARY RELIEF FOR:**<br><br>**1)   VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200);**<br><br>**2)   FRAUD;**<br><br>**3)   BREACH OF FIDUCIARY DUTY;**<br><br>**4)   NEGLIGENCE;**<br><br>**5)   RESCISSION;**<br><br>**6)   CALIFORNIA PENAL CODE SECTION 496(c); and**<br><br>**7)   UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Dwight J. Freeney, complaining of the above-named Defendants, alleges as follows:

## I.      INTRODUCTION

1.      This action arises out of Defendants' sale of unsuitable and ultimately worthless whole life insurance policies using false and fraudulent pretenses and involving the payment of secret and illegal kickbacks.

2.      The policies were sold to Dwight J. Freeney, a highly accomplished National Football League ("NFL") player who is employed by and plays for the San Diego Chargers NFL franchise.

3.      The policies, which totaled $55 million, were sold to Mr. Freeney by Defendant Eva Weinberg ("E.W.") and her brother, Defendant Richard Weinberg ("R.W."). The policies were issued by Defendants Metropolitan Life Insurance Company, Massachusetts Mutual Life Insurance Company and New York Life Insurance Company (collectively, the "Insurer Defendants"), for whom R.W. served as an agent.

4.      In 2010, at the height of his career, Mr. Freeney made the fateful decision to entrust his net worth and financial affairs to the investment division of a prominent national bank. The bank employed E.W., who it allowed to assume the roles of Mr. Freeney's financial manager and investment advisor, although she was not licensed to perform any of these services. E.W. used these positions of trust to defraud Mr. Freeney through various means and schemes, including the life insurance transactions that are the subject of this action.

5.      Shortly after she began acting as Mr. Freeney's financial manager and investment advisor, E.W. and her brother, R.W., devised a plan whereby they would fraudulently induce Mr. Freeney to purchase expensive whole life insurance policies (the "Policies"); R.W. would act as the insurance agent and receive the commissions from the sale of the Policies; and R.W. would then secretly pay a E.W. a large kickback from the commissions.

6.      In furtherance of this plan, R.W. immediately set out to obtain his

insurance agent's license, and become the appointed agent of each of the three Insurer Defendants.

7.     E.W. introduced Mr. Freeney to R.W., who assisted his sister in advising Mr. Freeney regarding the purchase of life insurance.  E.W. and R.W. represented to Mr. Freeney that: (a) they had expertise in the review, selection and purchase of high-dollar insurance products; (b) the purchase of $55 million in whole life insurance was a suitable, appropriate and beneficial investment for Mr. Freeney; (c) they had selected the policies that offered the best value to Mr. Freeney; and (d) it was in Mr. Freeney's best interest to purchase the whole life policies issued by the Insurer Defendants.

8.     All of these representations were false and misleading.  The true facts were that: (a) E.W. and R.W. had little or no expertise in reviewing and selecting high-dollar insurance products; (b) the Insurer Defendants' policies, which required annual premium payments totaling approximately $500,000 for a period of 15 years, were entirely unsuitable and inappropriate investments for Mr. Freeney, who was then age 29, single and in a sport where the average player retires by age 32; (c) E.W. and R.W. had not selected the Insurer Defendants' policies because they offered the best value to Mr. Freeney, but because they would result in the maximum commission payments to R.W.; and (d) E.W. and R.W. were recommending the purchase of the Policies not because it was in Mr. Freeney's best interest, but because they would result in the payment of large commissions by the Insurer Defendants, which R.W. would then secretly split with E.W.

9.     Relying upon the representations and recommendations of R.W. and E.W., Mr. Freeney purchased the Policies from each of the Insurer Defendants totaling $55 million.  The Insurer Defendants paid R.W. a total of approximately $450,000 in commissions as their agent for selling the Policies to Mr. Freeney. R.W. then paid approximately half this sum to E.W. as a kickback for her role in defrauding Mr. Freeney.

10.     One year later, E.W. and R.W. received notice that the second-year policy premiums were due, but thereafter allowed the Policies to lapse, rendering them worthless.  Plaintiff is informed and believes, and on that basis alleges, that E.W. and R.W. allowed the Policies to lapse because they could not receive any further commissions from the Policies, and because they wanted to maximize the funds that were available for E.W. and her other co-schemers to steal from Mr. Freeney through other schemes.

11.     Mr. Freeney received no benefit whatsoever from his "investment" of approximately $500,000 in the purchase of the Policies that E.W. and R.W. sold to him.

## II.     THE PARTIES

12.     Plaintiff Dwight J. Freeney is a resident of San Diego County, California.

13.     Defendant Eva. D. Weinberg, aka Eva Bock, is a resident of the State of Florida.  On June 23, 2013, in the federal criminal proceedings entitled *United States of America v. Eva D. Weinberg,* CR No. 13-0179-SVW (C.D. Cal.), E.W. was convicted of being an accessory after the fact, in violation of Title 18, United States Code, section 3, for helping to conceal a related but separate scheme to defraud Mr. Freeney of millions of dollars.  She is currently imprisoned at the Federal Correctional Institution in Danbury, Connecticut, serving the custodial portion of her sentence.

14.     Defendant Richard Weinberg is a resident of the State of New Jersey.

15.     Defendant Metropolitan Life Insurance Company dba MetLife ("MetLife") is a corporation organized and existing under the laws of the State of New York with its principal place of business located in New York, New York.

16.     Defendant Massachusetts Mutual Life Insurance Company dba MassMutual ("MassMutual") is a mutual life insurance company organized and existing under the laws of the State of Massachusetts with its principal place of business located in Springfield, Massachusetts.

17.     Defendant New York Life Insurance Company dba New York Life ("N.Y. Life") is a mutual life insurance company organized and existing under the laws of the

State of New York with its principal place of business located in New York, New York.

18.    Plaintiff is informed and believes, and on that basis alleges, that, at all relevant times, E.W. and R.W. were acting as each other's agents, partners, joint-venturers and/or co-schemers, and, in committing the wrongful acts and omissions described in this Complaint, were acting within the course and scope of that agency, partnership, joint venture and scheme.  Plaintiff is further informed and believes, and on that basis alleges, that, at all relevant times, E.W. and R.W. were acting in concert with each other in committing, and caused, aided, abetted, facilitated, encouraged, authorized, permitted and/or ratified, the wrongful acts and omissions described herein.

19.     Plaintiff is informed and believes, and on that basis alleges, that, at all relevant times, R.W. was acting as the agent of the Insurer Defendants, and each of them, and in committing the wrongful negligent acts and omissions described herein, was acting within the course and scope of that agency.

### III.   JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over the parties pursuant to Title 18, United States Code, section 1332 because Plaintiff is a citizen of a different state than all of the Defendants and because the amount in controversy exceeds $75,000, exclusive of costs and interest.

21.    This Court has personal jurisdiction over the parties to this action in that Defendants, and each of them, have the requisite minimum contacts with the State of California such that maintenance of this suit in this jurisdiction does not offend traditional notions of fair play and substantial justice.

22.    Pursuant to Title 28, United States Code, section 1391(b)(2), venue for this matter properly lies within the Central District of California in that a substantial part of the events, acts and/or omissions giving rise to the claims occurred within that judicial district; one or more of the Defendants are found, have an agent and/or transact their affairs within that judicial district; and process served in that district is required by the ends of justice.

## IV.   GENERAL ALLEGATIONS

**A.   California and Indiana Law Relating to the Sale of Insurance.**

23.    Both California and Indiana law explicitly prohibit deception in the sale of insurance, including the making of false or misleading statements concerning the purported benefits of an insurance policy, as well as explicitly prohibit the splitting of insurance commissions with persons unlicensed to sell insurance in that state.

24.    California law specifically provides that "[a]n insurer . . . or agent thereof, or an insurance broker or solicitor shall not cause or permit to be . . . used, any statement that is known, or should have been known, to be a misrepresentation of the following: (a) The terms of a policy issued by the insurer or sought to be negotiated by the person making or permitting the misrepresentation.  (b) The benefits or privileges promised thereunder.  (c) The future dividends payable thereunder."  (California Insurance Code section 780.)  A violation of this law is a criminal offense.  (*Id*., section 782.)

25.    California law also prohibits "twisting," making it a criminal offense for "[a] person [to] make any statement that is known, or should have been known to be a misrepresentation . . . to any person for the purpose of inducing, or tending to induce, such other person . . . to take out a policy of insurance . . . ."  (*Id*., sections 781 and 782.)

26.    In addition, California law provides that "a person shall not solicit, negotiate, or effect contracts of insurance . . . unless the person holds a valid license from the commissioner authorizing the person to act in that capacity."  (*Id*., section 1633.)  Splitting an insurance commission with an unlicensed person can constitute a violation of this prohibition (*Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*, 578 F. Supp. 2d 1242, 1247 (E.D. Cal. 2008)), which is punishable as a criminal offense.  (California Insurance Code section 1633.)

27.    The Indiana Unfair Competition Act, which regulates the business of insurance in that state, prohibits "misrepresenting the terms of any policy . . . or the

benefits or advantages promised thereby," or knowingly offering a policy "other than as plainly expressed" in the contract.  (Indiana Code section 27-4-1-4.)

28.     Under Indiana law, it is also unlawful for an insurance producer to split a commission payment with "a person for selling, soliciting, or negotiating insurance in Indiana if the person . . . is not licensed" (*id.,* section 27-1-15.6-3), and for an "insurance producer, broker, or solicitor" to agree to split a commission payment when that agreement "is not specified in the policy contract of insurance, or offer . . . ." (*Id.,* section 27-1-20-30.)

**B.     The Formation of the Plan to Defraud Mr. Freeney.**

29.     As descried above, Mr. Freeney is a professional football player.  In early 2010, Mr. Freeney was 29 years old and had three years remaining on his NFL contract with the Indianapolis Colts NFL franchise, for which he played at the time.  Like many professional athletes, he was not a sophisticated investor or astute financial planner, and thus relied upon others with purported expertise in these areas to manage his financial affairs and prudently invest his funds.

30.     In or about February 2010, Mr. Freeney agreed to transfer management of his assets and financial affairs to the investment division of the bank at which E.W. was employed.  In recruiting Mr. Freeney as a client, the investment division promised to provide an advisory team to handle all of Mr. Freeney's financial affairs, including recommending new investment opportunities and providing financial counseling and planning.

31.     E.W. was a part-time bank employee who was not licensed to give investment advice.  Nonetheless, the bank immediately placed her in control of the investment division's relationship with Mr. Freeney, and she became his private banker, financial manager and investment advisor.

32.     At the time E.W. became Mr. Freeney's financial manager and investment advisor, he was not knowledgeable about life insurance products as investments and he was not seeking to purchase life insurance.

**COMPLAINT**

33.    Plaintiff is informed and believes, and on that basis alleges, that in or about March 2010, E.W. and R.W. devised a plan to defraud Mr. Freeney by selling him whole life policies that would generate large commissions for R.W., which they would then secretly and illegally split between themselves.  Plaintiff is further informed and believes, and on that basis alleges, that E.W. and R.W. always intended the policies to serve as the instrumentality of their theft, rather than a legitimate investment for Mr. Freeney; that neither of them ever intended or expected that Mr. Freeney would receive any valuable benefits from his purchase of the policies; and that neither of them ever intended or expected for the policies to remain in effect after they had served their fraudulent purpose and the theft was completed.

34.    Plaintiff is further informed and believes, and on that basis alleges, that when this plan was devised, R.W. was not licensed as an insurance agent, broker, producer, or consultant, and had little or no experience with high-dollar whole life insurance products.

35.    In or about March 2010, within weeks of becoming Mr. Freeney's financial manager and investment advisor, E.W. advised Mr. Freeney that he should obtain whole life insurance as part of his overall investment portfolio.  E.W. introduced Mr. Freeney to the unlicensed R.W., falsely representing that R.W. had extensive knowledge and experience in the purchase and sale of life insurance products for investment and other purposes.  R.W. agreed at that time to act as Mr. Freeney's advisor in his purchase of appropriate whole life insurance.

36.    As Mr. Freeney's financial manager and investment advisor, E.W. owed Mr. Freeney the duties and obligations of a fiduciary.  As Mr. Freeney's insurance advisor, R.W. likewise owed Mr. Freeney the duties and obligations of a fiduciary.  The fiduciary duties they owed included: (a) the duty of undivided loyalty; (b) the duty to disclose all material information concerning the suitability, terms, costs and benefits of the insurance products under consideration; (c) the duty to provide competent services and advice; and (d) the duty to keep Mr. Freeney properly informed of the status of his

investment.

37.     In derogation of their fiduciary duties to Mr. Freeney, E.W. and R.W. encouraged and convinced Mr. Freeney to purchase up to $60 million in whole life insurance, claiming that this was a suitable, prudent and beneficial long-term investment for him, but never disclosing to him their plan to split the commissions resulting from these purchases and then allow the policies to lapse.  Trusting in the competence, loyalty and candor of E.W. and R.W., Mr. Freeney agreed to follow their recommendations and further agreed that E.W. and R.W. would select the insurance policies to be purchased and make the purchases on his behalf.

38.     At about the same time, R.W. applied to become a licensed insurance agent in the states of Indiana (where Mr. Freeney resided at the time) and New Jersey (where R.W. resided and still resides).

**C.     E.W. and R.W. Execute Their Plan.**

39.     Because R.W. was not yet a licensed insurance agent in early 2010, he solicited insurance agent Cliff Silverstein ("Silverstein") to obtain quotes from various life insurance companies.  R.W. represented to Silverstein that he was Mr. Freeney's financial advisor and that he was assisting Mr. Freeney with the purchase of $60 million in whole life insurance.  R.W. further informed Silverstein that he had applied for a life insurance agent's license in Indiana, and that he intended to collect the vast majority of the commissions paid on the policies.

40.     In or about April 2010, E.W. and R.W. arranged for Silverstein to meet with Mr. Freeney to begin the process of applying for life insurance on Mr. Freeney's behalf.  E.W. and R.W. directed Silverstein to submit insurance applications Mr. Freeney's behalf, and specifically instructed him to obtain the $60 million in whole life insurance in the form of multiple policies, rather than in a single, high-dollar policy, even though a single policy would have a higher cash surrender value, and therefore would have been a much better investment for Mr. Freeney.  Plaintiff is informed and believes, and on that basis alleges, that E.W. and R.W. instructed Silverstein to obtain

8

**COMPLAINT**

multiple policies for the sole or primary purpose of maximizing the resulting commission payments to R.W.

41.     In or about May 2010, Silverstein submitted at least four, and possibly up to seven, whole life insurance applications to various insurers that had been selected by E.W. and R.W., including defendants MetLife and MassMutual.

42.     In or about May 2010, E.W. traveled to Los Angeles and submitted information requested by MetLife and MassMutual while in California.

43.     In or about June 2010, E.W. temporarily moved to Los Angeles. Following her move, E.W. continued to act as Mr. Freeney's financial manager and investment advisor, and continued to advise Mr. Freeney concerning the purchase of whole life insurance.

44.     On or about May 6, 2010, R.W. became licensed to sell life insurance in New Jersey, his home state.

45.     On or about June 9, 2010, R.W. became licensed to sell life insurance in Indiana, where Mr. Freeney resided at the time.

46.     Plaintiff is informed and believes, and on that basis alleges, that R.W. was thereafter appointed to be an agent of each of the Insurer Defendants.  Plaintiff's information and belief is based upon R.W.'s designation as the Insurer Defendants' insurance agent in subsequent insurance applications, amended applications and related documents, the Insurer Defendants' payments of commissions to him, and the Insurer Defendants' acts of mailing premium payment and lapse notices to him.

47.     After he became an agent for the Insurer Defendants, R.W. assumed Silverstein's role in the sale of the Policies to Mr. Freeney.

**C.     E.W. and R.W. Fraudulently Induce Mr. Freeney to Purchase the Policies.**

48.     E.W. and R.W. falsely held themselves out as having special expertise involving life insurance products generally and high-dollar insurance products specifically.

49.     In or about July and August 2010, E.W. and R.W. recommended that

9

**COMPLAINT**

Mr. Freeney purchase the following whole life insurance policies: (a) a MetLife policy for $15 million; (b) a MassMutual policy for $20 million; and (c) a N.Y. Life policy for $20 million, for a total of $55 million in whole life insurance.  Plaintiff is informed and believes, and on that basis alleges, that E.W. and R.W. selected these policies because the sales commission paid by the Insurer Defendants on the policies ranged from 80% to 90% of the first-year's premiums, which was a higher percentage than other available polices would have paid.

50.    When they recommended that Mr. Freeney purchase the Policies, E.W. and R.W., and each of them, made the following false and misleading representations to Mr. Freeney, among others, to induce him to purchase the Policies:

A.    E.W. had substantial experience and expertise as a personal financial planner and investment advisor, and that this experience and expertise included the purchase of insurance products for investment and other purposes, when, in fact, she was not experienced, qualified, or licensed as a financial planner or investment advisor and had little or no experience and expertise in the review and selection of high-dollar insurance products for investment or other purposes.

B.    R.W. had substantial experience and expertise in the review, selection and purchase of insurance products for investment and other purposes, when, in fact, he had little or no experience or expertise in the review and selection of high-dollar insurance products for investment or other purposes.

C.    It was in Mr. Freeney's best financial interest for him to purchase $55 million in whole life insurance, when, in fact, it was not in Mr. Freeney's best financial interest for him to make this investment because:

(i)    He had just turned 30 years of age, was single and in good health, his financial goal was investment rather than estate planning, and there were other far more suitable and beneficial investments available to him;

(ii)    Given that professional football players on average retire by age 32, he should not have been sold policies for which the premiums were,

10
**COMPLAINT**

collectively, approximately $500,000 per year for the next 15 years; and

(iii)   Even if some form of life insurance was desirable, other insurance products were readily available that were less expensive and better suited to Mr. Freeney's insurance needs.

D.   E.W. and R.W. had selected the Policies because they offered the best value compared to other available whole life policies, when, in fact, they had selected the Policies for the sole or primary purpose of maximizing the commission payments to R.W.

E.   E.W. and R.W. were recommending the purchase of the Policies because it was in Mr. Freeney's best interest to make this investment, when, in fact, they were recommending that Mr. Freeney purchase the Policies to generate large commissions, 99% of which would be paid to R.W., who had agreed to kickback approximately half that amount to E.W.

51.   These misrepresentations were repeatedly made to Mr. Freeney over a period of several months in 2010, including by R.W. and E.W. at an in person meeting with Mr. Freeney at his Carmel, Indiana home in or about April 2010; by E.W. in person in Los Angeles in or about June 2010; and in telephone calls between Mr. Freeney and E.W. at various times from March through August 2010, when E.W. was in Los Angeles and Mr. Freeney was in various locations throughout the United States.

52.   Plaintiff is informed and believes, and on that basis alleges, that, when E.W. and R.W. recommended that Mr. Freeney purchase the Policies, they concealed and withheld the following material facts from Mr. Freeney, among others, to induce him to purchase of the Policies:

A.   E.W. had a secret agreement with R.W. that she would be paid a portion of the commissions from the sale of the Policies as a kickback.

B.   As a result of this agreement, E.W. had a serious actual conflict of interest in acting as Mr. Freeney's financial planner and investment advisor in the

purchase of the Policies.

        C.    E.W. and R.W. had structured the transaction based on the amount of commissions R.W. would be paid, rather than on the prices, surrender values and other costs and benefits to Mr. Freeney associated with the Policies.

        D.    The policy premiums totaled approximately $500,000 per year for a period of 15 years.

        E.    E.W., who controlled Mr. Freeney's finances, intended to allow the policies to lapse after the first year, unless she could generate additional commissions, that she and R.W. could split, by renewing the policies.

        F.    The Policies would have no cash surrender value and would be worthless if they were allowed to lapse after the first year.

53.    E.W., as Mr. Freeney's financial manager and investment advisor, and R.W., as his insurance advisor, each owed Mr. Freeney a duty to disclose these facts to him.

54.    In reliance on these false and misleading representations and concealed and withheld material facts, Mr. Freeney agreed to purchase the Policies.

55.    Between in on or about June 2010 and in or about August 2010, E.W. and R.W. prepared and/or caused to be submitted applications and/or amended applications and related documents to each of the Insurer Defendants.  Whereas the prior applications identified Silverstein as the insurance agent, these documents identified R.W. as the agent for each of the Defendant Insurers, and stated that he was to be paid 99% of the agent's commissions (with Silverstein to be paid the remaining 1%).

56.    In or about June 2010, acting in her capacity as Mr. Freeney's financial manager and investment advisor, E.W. opened two accounts at Citibank (a bank different from her employer) in the name of Mr. Freeney by presenting a power of attorney form purportedly signed by Mr. Freeney.  Thereafter, while in Los Angeles, E.W. caused the following three checks drawn on Mr. Freeney's Citibank account to be sent to the Insurer Defendants to pay the first-year premiums on the Policies:

(a) $141,200.00 to MetLife; (b) $186,850.00 to MassMutual; and (c) $181,300.00 to N.Y. Life.

57.     As a result of these premium payments: (a) MassMutual issued Mr. Freeney a $20 million whole life policy on or about July 6, 2010; (b) MetLife issued Mr. Freeney a $15 million whole life policy on or about July 16, 2010; and (c) N.Y. Life issued Mr. Freeney a $20 million whole life policy on or about July 28, 2010, which subsequently was amended to August 10, 2010 (to facilitate payment of the commission to R.W.).

58.     Of the approximately $500,000 in first-year premiums Mr. Freeney paid for the Policies, the Insurer Defendants paid a total of approximately $450,000 in agent commissions, 99% of which was distributed to R.W.

59.     Upon receiving the commission payments, R.W. paid kickbacks totaling in excess of $200,000 to E.W.  He made these payments either by endorsing the commission check to E.W.'s front company, Global Wealth Management, or issuing a check to Global Wealth Management.  R.W. mailed these checks to E.W. in Los Angeles, who deposited them to a Global Wealth Management bank account at the Larchmont Village Branch of Wells Fargo Bank in Los Angeles.

**D.      E.W. and R.W. Cause Mr. Freeney to Forfeit the Policies One Year Later.**

60.     As described above, each of the Policies required that Mr. Freeney make annual premium payments of approximately $500,000; otherwise, the policies would lapse and be cancelled.

61.     From in or about July 2011 through in or about September 2011, each of the Insurer Defendants mailed premium notices, past due notices and/or lapse notices to E.W. and R.W., indicating that the 2011 premium payments were due on each of the Policies.  E.W. received the notices in her capacity as Mr. Freeney's financial manager and investment advisor.  Certain of these notices were mailed to E.W. in Los Angeles.  Notices were also mailed to R.W. in his capacity as the agent who had sold the Policies to Mr. Freeney.

62.     When E.W. and R.W. failed to take any action in response to the notices they had received, Silverstein contacted E.W. to inquire why the annual premiums had not yet been paid.  When E.W. asked if further commissions would be paid if she made the premium payments, Silverstein informed her that very little in additional commissions would be paid from new premium payments.  Thereafter, E.W. and R.W. allowed each of the Policies to lapse.  The Policies had no cash surrender value and became worthless when they lapsed.

63.     Mr. Freeney did not know that the Policies were in danger of lapsing. When the Policies lapsed in or about September and October 2010, E.W. and R.W. did not advise him of this fact or that the Policies were now worthless.

64.     As a result of these acts and omissions, Mr. Freeney lost the full amount of his first-year premium payments, which totaled approximately $500,000, while each of the Defendants received a share of this $500,000 in the form of premiums, commissions, or kickbacks.

65.     In or about June 2012, R.W. allowed his two-year life insurance license in Indiana to lapse.

**E.     Defendants' Concealment, and Mr. Freeney's Discovery, of the Fraud.**

66.     In or about March 2012, E.W. was arrested in Los Angeles, California by the FBI on a federal criminal complaint charging her with wire fraud relating to another scheme to defraud Mr. Freeney.

67.     In or about September 2012, a private investigator retained by Mr. Freeney's counsel contacted R.W. telephonically and attempted to interview him, but he refused to answer any questions concerning his dealings with Mr. Freeney and E.W.

68.     In or about October 2012, Mr. Freeney's new accountants, while attempting to reconcile his bank accounts, received copies of the checks issued from Mr. Freeney's Citibank account to pay the Insurer Defendants.

69.     In or about March 2013, the United States Attorney's Office for the

Central District of California provided Mr. Freeney's counsel with various bank records, which included two checks from R.W. to Global Wealth Management.

70.     In or about October 2013, Mr. Freeney's accountants attempted to obtain documents related to his purchase of whole life policies from two of the Insurer Defendants; however, both of them refused to provide the requested documents. Thereafter, in other litigation, Mr. Freeney's counsel subpoenaed records from all three of the Insurer Defendants.  In or about October and November 2013, the Insurer Defendants produced the subpoenaed records, which included the insurance applications, amended applications and related documents referenced above.

71.     In or about November 2013, in other litigation, Mr. Freeney's counsel served R.W. with a federal subpoena compelling the production of documents related to Mr. Freeney's purchase of whole life policies; however, R.W. refused to produce any documents pursuant to the subpoena.

72.     Only as a result of the foregoing, all of which occurred within the past two years, did Mr. Freeney discover the facts giving rise to this action.

## FIRST CAUSE OF ACTION

### (For Violation of Business and

### Professions Code section 17200 *et seq.* Against All Defendants)

73.     Plaintiff repeats and realleges paragraphs 1 through 72 of this Complaint as if fully alleged herein.

74.     The California Unfair Competition Law ("UCL") (California Business and Professions Code section 17200 et seq.) prohibits "persons" from engaging in unfair competition, which includes "any unlawful, unfair or fraudulent business act or practice."

75.     During the relevant time period, E.W. and R.W., and each of them, violated and aided and abetted the violation of the UCL by engaging in one or more of the following *unlawful* business acts and practices, among others:

A.     Committing, and aiding and abetting the commission of, mail fraud

involving the deprivation of honest services, by using and causing the use of the United States mails to execute the above described scheme to defraud Mr. Freeney, in violation of Title 18, United States Code, sections 1341 and 2.

        B.    Committing, and aiding and abetting the commission of, wire fraud involving the deprivation of honest services, by using and causing the use of the interstate wire facilities to execute the above described scheme to defraud Mr. Freeney, in violation of Title 18, United States Code, sections 1343 and 2.

        C.    Engaging in, and aiding and abetting, the sale of insurance without a license, in violation of California Insurance Code sections 1631 and 1633 and California Penal Code section 31.

        D.    Committing, and aiding and abetting the commission of, grand theft, by obtaining possession of money belonging to Mr. Freeney by fraud or deceit [theft by trick]; obtaining both possession and ownership of that money by false or fraudulent pretenses [theft by false pretenses]; and fraudulently converting funds entrusted by Mr. Freeney to E.W.'s care [theft by embezzlement], in violation of California Penal Code sections 487 and 31.

        E.    Receiving, and aiding and abetting the receipt of, stolen property, by receiving Mr. Freeney's funds knowing that that they had been obtained by theft, and by concealing, withholding and aiding in the concealment and withholding of those funds from Mr. Freeney, in violation of California Penal Code sections 496(a) and 31.

    76.    During the relevant time period, E.W. and R.W., and each of them, violated and aided and abetted the violation of the UCL by engaging in one or more of the following ***unfair*** business acts and practices, among others:

        A.    Advising Mr. Freeney to purchase the Policies without disclosing that E.W. had a serious actual conflict of interest in acting as Mr. Freeney's financial manager and investment advisor in those purchases because of the secret agreement under which she was to receive kickbacks from the sale of the Policies.

        B.    Structuring the purchase of the Policies to maximize the amount of

commissions paid, rather than based on the prices, surrender values and other costs and benefits to Mr. Freeney associated with the Policies.

        C.     Failing to select insurance products that were suitable, prudent and beneficial investments for Mr. Freeney, considering his finances, financial goals and personal circumstances.

        D.     Allowing the Policies to lapse after the first year, rendering them worthless, because their renewal would not generate significant new commissions for E.W. and R.W. to split.

        77.     During the relevant time period, E.W. and R.W. and each of them violated and aided and abetted the violation of the UCL by engaging in one or more of the following *fraudulent* business acts and practices, among others:

        A.     Making false and misleading representations to Mr. Freeney that E.W. had substantial experience and expertise as a personal financial planner and investment advisor, and that this experience and expertise included the purchase of high-dollar insurance products for investment and other purposes.

        B.     Making false and misleading representations to Mr. Freeney that R.W. had substantial experience and expertise in the review, selection and purchase of high-dollar insurance products for investment and other purposes.

        C.     Making false and misleading representations to Mr. Freeney that it was in his best financial interest to purchase $55 million in whole life insurance for investment and other purposes, considering his finances, financial goals and personal circumstances.

        D.     Making false and misleading representations to Mr. Freeney that E.W. and R.W. had selected the Policies because they offered the best value for Mr. Freeney compared to other whole life policies available.

        E.     Making false and misleading representations to Mr. Freeney that E.W. and R.W. were recommending the purchase of the Policies because it was in Mr. Freeney's best interest to make this investment.

**COMPLAINT**

78.     In engaging in the unfair and fraudulent business acts and practices described above, R.W. was acting as an agent of the Insurer Defendants and within the course and scope of that agency, and therefore the Insurer Defendants, and each of them, are legally responsible and liable for his conduct.

79.     As a result of the unlawful, unfair and fraudulent business acts and practices described above, Mr. Freeney was injured in fact and lost money and property, according to proof at trial.

## SECOND CAUSE OF ACTION

### (For Fraud Against All Defendants)

80.     Plaintiff repeats and realleges paragraphs 1 through 79 of this Complaint as if fully alleged herein.

81.     In encouraging, inducing and causing Mr. Freeney to purchase the Policies, E.W. and R.W. knowingly and intentionally made the following false and misleading representations to Mr. Freeney, among others:

A.      E.W. had substantial experience and expertise as a personal financial planner and investment advisor, and that this experience and expertise included the purchase of high-dollar insurance products for investment and other purposes, when, in fact, she had little or no such experience and expertise.

B.      R.W. had substantial experience and expertise in the review, selection and purchase of high-dollar insurance products for investment and other purposes, when, in fact, he had little or no such experience and expertise.

C.      It was in Mr. Freeney's best financial interest for him to purchase $55 million in whole life insurance, when, in fact, this investment was not suitable, prudent, or beneficial for him, considering his finances, financial goals and personal circumstances.

D.      E.W. and R.W. had selected the Policies because they offered the best value compared to other available whole life policies, when, in fact, they had selected the Policies for the sole or primary purpose of maximizing the commission

1   payments to R.W.

2         E.    E.W. and R.W. were recommending the purchase of the Policies

3   because it was in Mr. Freeney's best interest to make this investment, when, in fact,

4   they were recommending this investment knowing that Mr. Freeney would not receive

5   any benefit from it and solely or primarily to obtain and split the resulting commissions.

6       82.    In encouraging, inducing and causing Mr. Freeney to purchase the Policies,

7   E.W. and R.W. also knowingly and intentionally concealed and withheld from

8   Mr. Freeney the following material facts, among others:

9         A.    E.W. had a secret agreement with R.W. that she would be paid a

10   portion of the commissions from the sale of the Policies as a kickback.

11         B.    As a result of this agreement, E.W. had a serious actual conflict of

12   interest in acting as Mr. Freeney's financial planner and investment advisor in the

13   purchase of the Policies.

14         C.    E.W. and R.W. had structured the purchase of the Policies based

15   solely or primarily on the amount of commissions R.W. would be paid, instead of the

16   prices, surrender values and other costs and benefits to Mr. Freeney associated with the

17   Policies.

18         D.    The policy premiums totaled approximately $500,000 per year for a

19   period of 15 years.

20         E.    E.W., who controlled Mr. Freeney's finances, intended to allow the

21   Policies to lapse after the first year, unless she could generate additional commissions

22   by renewing the policies (which she eventually determined she could not).

23         F.    The Policies would have no cash surrender value and be worthless if

24   they lapsed after the first year.

25       83.    E.W. and R.W., and each of them, made the false and misleading

26   representations and concealed and withheld the material facts described above with the

27   intent to induce Mr. Freeney to entrust them with his financial and insurance decisions

28   and to authorize them to purchase the Policies on his behalf.

84.     As a direct and proximate result of the fraudulent acts and omissions described above, E.W. and R.W., and each of them, caused Mr. Freeney to purchase the Policies and to pay approximately $500,000 in first-year premiums.  If Mr. Freeney had known the true facts, he would not have entrusted E.W. and R.W. with his financial and insurance decisions or authorized them to purchase the Policies on his behalf.

85.     As a direct and proximate result of the fraudulent acts and omissions described above, Mr. Freeney has been damaged in an amount to be determined at trial, but estimated to be in excess of $500,000.

86.     In engaging in the fraudulent acts and omissions described above, R.W. was acting as an agent of the Insurer Defendants and within the course and scope of that agency, and therefore the Insurer Defendants, and each of them, are legally responsible and liable for R.W.'s conduct.

87.     In committing the acts and omissions described in this Cause of Action, E.W. and R.W. acted fraudulently, oppressively and maliciously, with a willful and conscious disregard of Mr. Freeney's rights.  Accordingly, Mr. Freeney is entitled to exemplary and punitive damages from them pursuant to California Civil Code section 3294.

## THIRD CAUSE OF ACTION

### (For Breach of Fiduciary Duty Against All Defendants)

88.     Plaintiff repeats and realleges paragraphs 1 through 87 of this Complaint as if fully alleged herein.

89.     As Mr. Freeney's financial manager and investment advisor, E.W. owed him the duties and obligations of a fiduciary.  As Mr. Freeney's insurance advisor, R.W. likewise owed him the duties and obligations of a fiduciary.  The fiduciary duties owed by E.W. and R.W., and each of them, included: (a) the duty of undivided loyalty; (b) the duty to disclose all material information concerning the suitability, terms, costs and benefits of the Policies; (c) the duty to provide competent advice and services; and (d) the duty to keep Mr. Freeney properly informed of the status of his investment.

90.     Mr. Freeney reasonably relied on the professional competence, expertise and honesty of E.W. and R.W. in purchasing the Policies.

91.     E.W. and R.W., and each of them, breached their fiduciary duties to Mr. Freeney, and aided and abetted each other in breaching their fiduciary duties to Mr. Freeney, by committing the acts and omissions described in this Complaint, including, without limitation, all of the following:

A.     Falsely representing to Mr. Freeney that E.W. had substantial experience and expertise as a personal financial planner and investment advisor, and that this experience and expertise included the purchase of high-dollar insurance products for investment and other purposes.

B.     Falsely representing to Mr. Freeney that R.W. had substantial experience and expertise in the review, selection and purchase of high-dollar insurance products for investment and other purposes.

C.     Falsely representing that it was in Mr. Freeney's best financial interest for him to purchase $55 million in whole life insurance.

D.     Falsely representing that E.W. and R.W. had selected the Policies because they offered the best value compared to other available whole life policies.

E.     Falsely representing that E.W. and R.W. were recommending the purchase of the Policies because it was in Mr. Freeney's best interest to make this investment.

F.     Failing to disclose that E.W. had a secret agreement with R.W. that she would be paid a portion of the commissions from the sale of the Policies as a kickback.

G.     Failing to disclose that, as a result of this agreement, E.W. had a serious actual conflict of interest in acting as Mr. Freeney's financial planner and investment advisor in the purchase of the Policies.

H.     Failing to disclose that E.W. and R.W. had structured the purchase of the Policies based on the amount of commissions paid, rather than the prices,

**COMPLAINT**

surrender values and other costs and benefits to Mr. Freeney associated with the Policies.

I.     Failing to disclose that the policy premiums totaled approximately $500,000 per year for a period of 15 years.

J.     Failing to disclose that E.W., who controlled Mr. Freeney's finances, intended to allow the Policies to lapse after the first year, unless the renewal of the Policies would generate significant additional commissions.

K.     Failing to disclose that the Policies would have no cash surrender value and be worthless if they lapsed after the first year.

92.     E.W. owed Mr. Freeney a further fiduciary duty when referring the services of others, including: (a) the duty to ensure that the person being referred was competent, qualified and trustworthy; and (b) the duty to disclose all known relevant facts about the person being referred and ensure the accuracy of that information.

93.     E.W. breached this duty by referring R.W. to Mr. Freeney, knowing that R.W. had little, if any, experience or expertise in reviewing and selecting insurance products, much less high-dollar whole life policies for investment purposes; knowing that R.W.'s sole or primary goal in the sale of the Policies to Mr. Freeney was to maximize the amount of commissions he would be paid; and knowing that R.W. intended and had agreed to secretly kickback a substantial portion of those commissions to E.W.

94.     As a direct and proximate result of E.W. and R.W.'s breaches of their fiduciary duties, Mr. Freeney has been damaged in an amount to be determined at trial.

95.     In breaching his fiduciary duties to Mr. Freeney as described above, R.W. was acting as an agent of the Insurer Defendants and within the course and scope of that agency, and therefore the Insurer Defendants, and each of them, are legally responsible and liable for R.W.'s conduct.

96.     In breaching their fiduciary duties to Mr. Freeney, E.W. and R.W, and each of them, acted fraudulently, oppressively and maliciously, with a willful and conscious

disregard of Mr. Freeney's rights.  Accordingly, Mr. Freeney is entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

## FOURTH CAUSE OF ACTION

### (For Negligence Against All Defendants)

97.   Plaintiff repeats and realleges paragraphs 1 through 96 of this Complaint as if fully alleged herein.

98.   As Mr. Freeney's financial manager and investment advisor, E.W. owed Mr. Freeney a duty to exercise reasonable care when referring the services of others, including: (a) the duty to communicate only accurate information about the skills and professional reputation of the person being referred; (b) the duty to ensure that the person being referred was competent, qualified and trustworthy; and (c) the duty to disclose all known relevant facts and reliable information about the person being referred.

99.   E.W. beached this duty of care to Mr. Freeney when she referred R.W. to him to act as his insurance advisor, because she knew or should have known that R.W. lacked the experience and expertise to provide such services in a reasonably competent and reliable manner.

100.   As Mr. Freeney's financial manager and investment advisor, E.W. also owed Mr. Freeney a duty of care to perform her services consistent with the standards of care then prevailing in the communities in which she provided her services.

101.   As Mr. Freeney's insurance advisor, R.W. similarly owed Mr. Freeney a duty of care to perform his services consistent with the standards of care then prevailing in the communities in which he provided his services, including the duty to provide competent and honest advice about the suitability, terms, costs and benefits of the insurance products he was recommending and how those products compared in these respects to other available insurance products.

102.   In purchasing the Policies, Mr. Freeney reasonably relied on the professional competence and expertise of both E.W. and R.W.

103.   E.W. and R.W. breached their respective duties of care to Mr. Freeney by, among other things:

A.   Advising Mr. Freeney to purchase up to $60 million in whole life insurance because it was purportedly a prudent and appropriate investment, when, in fact, the purchase of that amount of whole life insurance was not a reasonably prudent or appropriate investment for Mr. Freeney.

B.   Causing Mr. Freeney to purchase $55 million in whole life insurance that required annual premiums of approximately $500,000 per year for 15 years, which was not a suitable investment for Mr. Freeney considering his finances, financial goals and personal circumstances.

C.   Failing to advise Mr. Freeney of more appropriate and beneficial investment opportunities and insurance alternatives.

D.   Allowing the Policies to lapse and become worthless after only one year, so that Mr. Freeney received no benefit whatsoever in return for his investment of approximately $500,000.

104.   In committing the acts of negligence described above, R.W. was acting as an agent of the Insurer Defendants and within the course and scope of that agency, and therefore the Insurance Defendants are legally responsible and liable for his misfortune.

105.   In addition, the Insurer Defendants, and each of them, owed a duty of care to their insureds, including Mr. Freeney, to properly screen, reasonably train and adequately supervise and monitor their insurance agents' marketing and sales practices.

106.   The Insurer Defendants, and each of them, breached this duty to Mr. Freeney by, among other things:

A.   Negligently permitting R.W. to act as their agent for the sale of the Policies to Mr. Freeney, when he was unfit, incompetent and lacked the necessary training and experience to perform such services.

B.   Negligently failing to properly supervise R.W.'s work within the scope course and of his agency, including failing to properly supervise R.W. in his

**COMPLAINT**

dealings with Mr. Freeney.

107.   The Insurer Defendants, and each of them, could and should have known that R.W. was unfit, incompetent and inadequately trained and supervised, and that his unfitness, incompetence and lack of training and supervision created a particular risk to their insureds, including Mr. Freeney.  The Insurer Defendants, and each of them, also could and should have foreseen that allowing R.W. to handle Mr. Freeney's purchase of the Policies, with virtually no supervision or monitoring, was likely to result in the very harm that Mr. Freeney has suffered in this case.  The Insurer Defendants' negligence in screening, training, supervising and monitoring R.W. was a substantial factor in causing this harm.

108.   As a direct and proximate result of Defendants' breaches of their respective duties of care to Mr. Freeney, he has been injured in in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

### (For Rescission Against the Insurer Defendants)

109.   Plaintiff repeats and realleges paragraphs 1 through 108 of this Complaint as if fully alleged herein.

110.   Mr. Freeney entered into contracts with each of the Insurer Defendants pursuant to which he paid the Insurer Defendants a total of approximately $500,000 in first-year premiums, and pursuant to which each of the Insurer Defendants issued whole life insurance policies to him.

111.   As described above, Mr. Freeney's consent to the issuance of each of the Policies was obtained through fraud and undue influence, exercised by and with the connivance of each of the Insurer Defendants acting by and through their agent R.W.

112.   As also described above, the consideration received by Mr. Freeney in the form of the Policies has failed, in whole or in part, because the Insurer Defendants' agent R.W., acting in concert with E.W., permitted the Policies to lapse as part of R.W. and E.W.'s plan to defraud Mr. Freeney.

**COMPLAINT**

113.   As also described above, the Insurer Defendants, and each of them, acting by and through their agent R.W., made material false representations to Mr. Freeney.

114.   As also described above, the Insurer Defendants, and each of them, acting by and through their agent R.W., neglected to communicate material information to Mr. Freeney about the Policies, information that they knew and ought to have communicated to Mr. Freeney before he purchased them.

115.   Mr. Freeney has been injured as a direct and proximate result of the acts of fraud, undue influence, material false representations and non-disclosure committed by the Insurer Defendants, acting by and their agent R.W.  Accordingly, pursuant to California Insurance Code sections 330, 331 and 359, Mr. Freeney is entitled to, and hereby demands, the rescission of the Policies that he entered into with the Insurance Defendants, and each of them.

## SIXTH CAUSE OF ACTION

### (For Violation of Penal Code section 496(c) Against E.W. and R.W.)

116.   Plaintiff repeats and realleges paragraphs 1 through 115 of this Complaint as if fully alleged herein.

117.   As described above, E.W. and R.W., and each of them, received, and aided and abetted each other in the receipt of, stolen property in violation of California Penal Code sections 496(a) and 31, by receiving Mr. Freeney's funds knowing that they had been obtained by theft, and by concealing, withholding and aiding in the concealment and withholding of the funds from Mr. Freeney.

118.   As a direct and proximate result of E.W. and R.W.'s violations of California Penal Code sections 496(a) and 31, Mr. Freeney has been injured in in an amount to be determined at trial.

119.   California Penal Code section 496(c) establishes a civil cause of action for violations of California Penal Code section 496(a), pursuant to which Mr. Freeney is entitled to recover treble damages, his costs of suit and his reasonable attorney's fees.

///

**COMPLAINT**

### SEVENTH CAUSE OF ACTION

### (For Unjust Enrichment Against E.W. and R.W.)

120.   Plaintiff repeats and realleges paragraphs 1 through 119 of this Complaint as if fully alleged herein.

121.   Through their wrongful conduct, E.W. and R.W., and each of them, have unjustly enriched themselves receiving and retaining the insurance commissions that the Insurer Defendants paid to R.W. from the premiums that they collected from Mr. Freeney.

122.   As described in this Complaint, Mr. Freeney has been injured as a direct and proximate result of this wrongful conduct.  In equity and in good conscience, it would be unjust for E.W. and R.W., and each of them, to be permitted to retain the insurance commissions they received at Mr. Freeney's expense.  They should, therefore, be required to disgorge all such commissions or the value thereof.

### PRAYER FOR RELIEF

Wherefore, Plaintiff Dwight J. Freeney prays for judgment against Defendants, and each of them, as indicated:

**AS TO THE FIRST CAUSE OF ACTION:**

1.   For restitutionary disgorgement in an amount according to proof at trial; and

2.   For interest on said amount at the maximum rate permitted by law.

**AS TO THE SECOND CAUSE OF ACTION:**

1.   For damages in an amount according to proof at trial;

2.   For interest on said amount at the maximum rate permitted by law; and

3.   For punitive and exemplary damages against E.W. and R.W. according to proof at trial and to the extent permitted by law.

**AS TO THE THIRD CAUSE OF ACTION:**

1.   For damages in an amount according to proof at trial;

2.   For interest on said amount at the maximum rate permitted by law; and

**COMPLAINT**

3.     For punitive and exemplary damages against defendants E.W. and R.W. according to proof at trial and to the extent permitted by law.

**AS TO THE FOURTH CAUSE OF ACTION:**

1.     For damages in an amount according to proof at trial; and

2.     For interest on said amount at the maximum rate permitted by law.

**AS TO THE FIFTH CAUSE OF ACTION:**

1.     For rescission of Mr. Freeney's insurance contracts with MetLife, MassMutual and N.Y. Life; and

2.     For the return of all monies paid pursuant to those contracts, together with interest on those monies at the maximum rate permitted by law.

**AS TO THE SIXTH CAUSE OF ACTION:**

1.     For damages in an amount according to proof at trial;

2.     For the trebling of those damages;

3.     For prejudgment interest at the maximum rate permitted by law; and

4.     For Mr. Freeney's reasonable attorney's fees.

**AS TO THE SEVENTH FIRST CAUSE OF ACTION:**

1.     For disgorgement in an amount according to proof at trial; and

2.     For interest on said amount at the maximum rate permitted by law.

**AS TO ALL CAUSES OF ACTION:**

1.     For Plaintiff's costs of suit incurred herein; and

2.     For such other and further relief as the Court deems just and proper.

Dated:  July 7, 2014                    ISAACS FRIEDBERG & LABATON LLP


                                        _____
                                        /s/  Jeffrey B. Isaacs
                                        JEFFREY B. ISAACS, ESQ.
                                        Attorneys for Plaintiff Dwight J. Freeney

**COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Plaintiff Dwight J. Freeney hereby demands a jury trial on all issues properly triable to a jury.

Dated:  July 7, 2014                     ISAACS FRIEDBERG & LABATON LLP


                                         /s/  Jeffrey B. Isaacs
                                         JEFFREY B. ISAACS, ESQ.
                                         Attorneys for Plaintiff Dwight J. Freeney

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28